**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2925-23

ANNE ROBINA WALKER,

      Plaintiff-Appellant/
      Cross-Respondent,

v.

JEROME SAHLMAN,

      Defendant-Respondent/
      Cross-Appellant.

_____

         Submitted February 3, 2026 – Decided July 1, 2026

         Before Judges Susswein and Augostini.

         On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FM-07-0564-20.

         Jardim, Meisner, Salmon, Sprague & Susser, PC, attorneys for appellant/cross-respondent (Jessica Ragno Sprague, on the briefs).

         Berse Law, LLC, attorneys for respondent/cross appellant (Jenny Berse and Samuel J. Berse, of counsel and on the briefs).

PER CURIAM

In this matrimonial matter, both parties appeal from an April 15, 2024, final judgment of divorce (FJOD) and accompanying 103-page decision entered after a trial. Plaintiff Anne Robina Walker appeals the parts of the FJOD awarding her $2,000 per month in alimony for a specified period and $67,620 in counsel fees, claiming both amounts are inadequate. She also argues that the trial court erred in deeming certain assets exempt from equitable distribution. Defendant Jerome Sahlman cross-appeals, arguing that the trial court erred in awarding any alimony and counsel fees to plaintiff, and further erred by failing to recognize that one of the properties at issue was solely owned by him and exempt from equitable distribution.

After reviewing the record in light of the governing legal principles, we affirm the alimony award. We also affirm the award of attorney fees to plaintiff but remand for the court to consider defendant's request for attorney fees. With respect to the dispute over equitable distribution, we generally affirm the trial court's decision but remand for the court to make additional findings and conclusions with respect to four specific accounts and instruct the court on remand to make additional findings regarding the 27 Berkeley Place property.

A-2925-23

I.

We presume the parties are familiar with the procedural history and the facts that were elicited at the divorce trial. On April 15, 2024, the trial court issued a final judgment of divorce (FJOD), with an accompanying written opinion. The court: (1) awarded plaintiff $2,000 per month in alimony until she was eligible to receive social security benefits in the amount of at least $24,000 per year or until further court order; (2) denied defendant's request for a Mallamo[1] credit of approximately $500,000; (3) directed that defendant receive a credit for the paydown of the mortgages for the marital home and the Vermont home from the date of the divorce complaint until closing; (4) ordered plaintiff to pay twenty-eight percent of college expenses for the parties' son, Harry; (5) directed that plaintiff receive half of the monies in certain bank and investment accounts in defendant's name (his individual checking and savings accounts, his Newbridge Securities account, and his Merrill Lynch accounts OU94, 2376 and OW10); (6) directed that defendant receive half of the monies in certain bank and investment accounts in plaintiff's name (her individual checking and saving accounts and Merrill Lynch accounts); (7) directed that plaintiff's two percent interest in Boonton Holdings be equally divided between the parties; (8) ordered

---

[1] Mallamo v. Mallamo, 280 N.J. Super. 8 (App. Div. 1995).

A-2925-23

that the net proceeds realized by defendant from the Morristown Gateway property be divided equally between the parties; (9) ordered that defendant's interest in the Olyphant property be appraised and that plaintiff either receive a credit for fifty percent of its present value or an actual fifty percent share of defendant's interest in that property; (10) directed that plaintiff receive a credit in the amount of $154,722, representing fifty percent of the monies received post-complaint by defendant for monies loaned to Joe Gorga pre-complaint; (11) ordered that the 27 Berkeley Place property be reappraised and defendant pay plaintiff fifty percent of the equity therein; (12) directed that the parties equally share the coverture portion of plaintiff's pension; (13) ordered that one of the parties buy out the other's interest in the former marital home at its stipulated value and in the Vermont home at a newly appraised value; (14) ordered that the remaining four rental properties (Portland Place, 430 Valley Road, Brookfield Road, and 157 Valley Road) be divided by the parties with each receiving in the aggregate approximately fifty percent of the total equity in the properties and approximately fifty percent of the aggregate expected cash flow; and (15) granted plaintiff's request for attorney fees and expert fees in an aggregate amount of $67,620, with defendant receiving a credit for the $50,000 he advanced pendente lite.

4

This appeal follows. Plaintiff raises the following contentions for our consideration:

POINT I

THE TRIAL COURT ERRED IN ONLY AWARDING PLAINTIFF $2,000 PER MONTH IN ALIMONY, AND FIXING AUTOMATIC TERMINATION WHEN SHE RECEIVED SOCIAL SECURITY AGE[.]

POINT II

THE TRIAL COURT MADE MULTIPLE ERRORS ON EQUITABLE DISTRIBUT[I]ON[.]

POINT III

THE TRIAL COURT ERRED IN LIMITING THE AWARD OF COUNSEL FEES AND COSTS[.]

Defendant raises the following contentions in his cross-appeal:

POINT I

EQUITABLE DISTRIBUTION OF THE PARTIES' ACCOUNTS SHOULD BE AFFIRMED AND EQUITABLE DISTRIBUTION OF THE 27 BERKELEY PROPERTY SHOULD BE VACATED AND EITHER DE NOVO AWARDED TO [DEFENDANT] OR REMANDED FOR PROPER DETERMINATION.

POINT II

THIS COURT SHOULD VACATE THE ALIMONY AWARD AND [DEFENDANT] SHOULD BE AWARDED A CREDIT FOR OVERPAID ALIMONY.

5                                                    A-2925-23

POINT III

THIS COURT SHOULD VACATE THE COUNSEL FEE AWARD AND REMAND FOR FURTHER PROCEEDINGS.

II.

We first address the dispute regarding alimony. When assessing the appropriateness of an alimony award, a reviewing court must give deference to the trial court's findings. Cesare v. Cesare, 154 N.J. 394, 411-12 (1998); Harte v. Hand, 433 N.J. Super. 457, 461 (App. Div. 2013). To vacate a trial court's findings concerning alimony, an appellate court must conclude that the trial court clearly abused its discretion by failing to consider all of the controlling legal principles or by making determinations that could not reasonably have been reached on the record. Gonzalez-Posse v. Ricciardulli, 410 N.J. Super. 340, 354 (App. Div. 2009).

A court may award alimony (open durational, rehabilitative, limited duration, or reimbursement) as the circumstances of the parties and the nature of the case render reasonable and just. N.J.S.A. 2A:43-23(b); Gonzalez-Posse, 410 N.J. Super. at 353; Cox v. Cox, 335 N.J. Super. 465, 474 (App. Div. 2000). The basic purpose of alimony is "to assist the supported spouse in achieving a lifestyle that is reasonably comparable to the one enjoyed while living with the

6

supporting spouse during the marriage." Crews v. Crews, 164 N.J. 11, 16 (2000). "Bare survival is not the proper standard, it is the quality of the economic life during the marriage that determines alimony." Hughes v. Hughes, 311 N.J. Super. 15, 31 (App. Div. 1998). The establishment of the marital lifestyle is "the touchstone" for an alimony award. Crews, 164 N.J. at 16.

Pursuant to N.J.S.A. 2A:34-23(b), a trial judge must consider the following factors in determining whether to award alimony and in what amount:

> (1) The actual need and ability of the parties to pay;
>
> (2) The duration of the marriage . . .;
>
> (3) The age, physical and emotional health of the parties;
>
> (4) The standard of living established in the marriage and the likelihood that each party can maintain a reasonably comparable standard of living . . . ;
>
> (5) The earning capacities, educational levels, vocational skills, and employability of the parties;
>
> (6) The length of absence from the job market of the party seeking maintenance;
>
> (7) The parental responsibilities for the children;
>
> (8) The time and expense necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment, the availability of the training and employment, and the

A-2925-23

opportunity for future acquisitions of capital assets and income;

(9) The history of the financial or non-financial contributions to the marriage or civil union by each party including contributions to the care and education of the children and interruption of personal careers or educational opportunities;

(10) The equitable distribution of property ordered and any payouts on equitable distribution, directly or indirectly, out of current income, to the extent this consideration is reasonable, just and fair;

(11) The income available to either party through investment of any assets held by that party;

(12) The tax treatment and consequences to both parties of any alimony award, including the designation of all or a portion of the payment as a non-taxable payment;

(13) The nature, amount, and length of pendente lite support paid, if any; and

(14) Any other factors which the court may deem relevant.

[N.J.S.A. 2A:34-23(b)(1) to (14).]

N.J.S.A. 2A:34-23(j)(1) authorizes the modification or termination of alimony upon the prospective or actual retirement of the obligor:

(1) There shall be a rebuttable presumption that alimony shall terminate upon the obligor spouse or partner attaining full retirement age, except that any arrearages that have accrued prior to the termination date shall not be vacated or annulled. The court may

8

set a different alimony termination date for good cause shown based on specific written findings of fact and conclusions of law.

The rebuttable presumption may be overcome if, upon consideration of the following factors and for good cause shown, the court determines that alimony should continue:

(a) The ages of the parties at the time of the application for retirement;

(b) The ages of the parties at the time of the marriage or civil union and their ages at the time of entry of the alimony award;

(c) The degree and duration of the economic dependency of the recipient upon the payor during the marriage or civil union;

(d) Whether the recipient has foregone or relinquished or otherwise sacrificed claims, rights or property in exchange for a more substantial or longer alimony award;

(e) The duration or amount of alimony already paid;

(f) The health of the parties at the time of the retirement application;

(g) Assets of the parties at the time of the retirement application;

(h) Whether the recipient has reached full retirement age as defined in this section;

(i) Sources of income, both earned and unearned, of the parties;

9

(j) The ability of the recipient to have saved adequately for retirement; and

(k) Any other factors that the court may deem relevant.

If the court determines, for good cause shown based on specific written findings of fact and conclusions of law, that the presumption has been overcome, then the court shall apply the alimony factors as set forth in subsection b. of this section to the parties' current circumstances in order to determine whether modification or termination of alimony is appropriate. If the obligor intends to retire but has not yet retired, the court shall establish the conditions under which the modification or termination of alimony will be effective.

[N.J.S.A. 2A:34-23(j)(1).]

We next apply these general principles to the present facts as found by the trial court. In the portion of its opinion addressing alimony, the court determined that the presumption against alimony due to defendant's age and his expressed desire to retire had been rebutted. The court noted: (1) the parties' current ages (seventy-four and sixty) and ages at the time of the marriage; (2) that plaintiff was dependent upon defendant for many years of the marriage and that defendant "clearly funded the lifestyle of the family by paying the 'big' bills;" (3) that both parties were in good health; (4) that both parties had substantial assets and that plaintiff's assets would be augmented through equitable distribution; and (5) that plaintiff would have sufficient monies for

retirement because of her pension and the income generated by her rental properties. The court continued:

> At trial, several unique facts were established that affect that analysis regarding [d]efendant's retirement. First, [d]efendant expects to earn commissions for his eventual work in obtaining tenants for Boonton Holdings and 95 Shepherds Lane. In that regard, [d]efendant waived $139,000 in interest that was due from Joe Gorga. Second, in the recent past, after the filing of the Complaint in this matter, [d]efendant has loaned Mr. Gorga in 2021 an additional $700,000. The purpose of loaning Mr. Gorga money in the past, as testified to by [d]efendant, was to enable Mr. Gorga to complete construction of his real estate projects, with [d]efendant then earning commissions by facilitating the sale or rentals of those units as a realtor. Defendant has not loaned Mr. Gorga money to passively earn interest, as evident from the fact that previously [d]efendant did not even seek to collect interest from Mr. Gorga and in fact waived significant interest based on the business to be generated by Mr. Gorga.
>
> Indeed, loaning Mr. Gorga nearly three-quarters of a million dollars shortly after waiving $139,000 in interest demonstrates a clear intent on [d]efendant's part that he is expecting or, at a minimum, desires to be in a position to earn significant commissions as a realtor when those projects are finished. Thus, it is clear to the Court that [d]efendant intends to receive significant business as a realtor going forward from Mr. Gorga and to remain actively employed in that capacity. Defendant certainly has the right to loan significant sums to Mr. Gorga and to expect to continue to earn commissions from his projects, but under the facts and

11

circumstances of this matter, that sufficiently rebuts any claim of retirement.

To be clear, [d]efendant is certainly able to retire if he so chooses. It would be inappropriate for a [c]ourt to force [d]efendant to work to pay alimony as he has reached the full retirement age. But if [d]efendant chooses to work and to earn income, then alimony may be appropriate. Again, the [c]ourt does not understand alimony to stop automatically where the obligor is of full retirement age and is still actively working and earning money in his chosen profession and able to pay alimony.

The record is clear, and [d]efendant has so testified, that the loans to Mr. Gorga are to enable Mr. Gorga to complete residential projects, which then affords [d]efendant [the opportunity] to earn substantial commissions on renting or selling those units. This is vastly different from passively investing money. In short, [d]efendant's recent and continued loans to Mr. Gorga to the tune of $700,000 rebuts the presumption especially in light of [d]efendant recently waiving $139,000 [in interest] shortly before the completion of several of Mr. Gorga's then existing projects.

The trial court next considered the factors set forth in N.J.S.A. 2A:34-23(b), finding that: (1) defendant had the resources to pay alimony and plaintiff had a need for alimony to maintain the marital lifestyle; (2) the parties were married for twenty-three and one-half years; (3) after adjustments to the parties' case information statements (CISs), the marital lifestyle was $16,691 per month; (4) after equitable distribution and her expected inheritance, plaintiff would

12

have approximately $2,500,000 in liquid assets, plus yearly net income of $137,235 ($11,436 per month) comprised of interest on her liquid assets of $87,500 per year, $15,000 per year in rental income, and her yearly salary; and (5) after equitable distribution, and without taking into account the $700,000 loaned to Gorga, defendant would have approximately $1,800,000 in liquid assets, plus an additional $950,000 in exempt assets, and yearly net income of $238,271 ($19,855 per month) comprised of social security, rental income, and realtor commissions.

Based upon these findings, the trial court ordered that plaintiff receive "open duration alimony in the amount of $2,000 per month until [p]laintiff receives social security benefits (which will likely provide [p]laintiff with more than $24,000) or until [d]efendant sets his retirement date by motion." With respect to defendant's request for a Mallamo adjustment, the trial court granted defendant a credit for the paydown of the mortgages on the marital home and the Vermont property but declined to award an additional credit for the alimony and pendente lite support he paid. The court noted that "[t]he vast majority" of the expenditures provided by defendant had no description or basis justifying a credit.

While the alimony award does not completely bring plaintiff's net monthly income to the standard of living during the marriage, we deem it to be reasonable given defendant's age and plaintiff's assets. As to the potential termination of alimony, we note that defendant will be eighty years old when plaintiff reaches age sixty-seven and begins receiving social security. Assuming defendant has not already voluntarily retired,[2] it seems unreasonable to expect that he would still be working at full capacity. Finally, the court's decision denying defendant's request for an additional credit for the pendente lite support paid is supported by the record, which demonstrates that defendant failed to supply adequate proofs to substantiate his request. Accordingly, we see no abuse of discretion with respect to the alimony award.

## III.

We next address the dispute regarding equitable distribution. We again begin our analysis by acknowledging the governing legal principles. A trial court is vested with broad discretion in determining how to best divide the

---

[2] The trial court found that defendant's decisions to forgive interest on prior loans to Gorga and to loan Gorga $700,000 in 2021 clearly evinced an intent to continue working. We add that in the event defendant chose to retire before plaintiff reached full retirement age, he would be free to file a motion to terminate his alimony obligation.

marital assets. Wadlow v. Wadlow, 200 N.J. Super. 372, 377 (App. Div. 1985). "Appellate review pertaining to the division of marital assets is narrow." Valentino v. Valentino, 309 N.J. Super. 334, 339 (App. Div. 1998). Our review is limited to determining whether the court's decision "could reasonably have been reached by the trial judge on the evidence, or whether it is clearly unfair or unjustly distorted by a misconception of the law or findings of fact that are contrary to the evidence." Wadlow, 200 N.J. Super. at 382 (quoting Perkins v. Perkins, 159 N.J. Super. 243, 247 (App. Div. 1978)).

In effectuating an equitable distribution of the marital assets pursuant to N.J.S.A. 2A:34-23.1, the trial court must first decide what property is eligible for distribution and determine that property's value. Thieme v. Aucoin-Thieme, 227 N.J. 269, 284 (2016); Rothman v. Rothman, 65 N.J. 219, 232 (1974). Then, it must decide how such allocation can most equitably be made. Ibid. When determining the equitable distribution of marital assets, the court must consider criteria including, but not limited to:

(a) the duration of the marriage . . .;

(b) The age and physical and emotional health of the parties;

(c) The income or property brought to the marriage . . . by each party;

(d) The standard of living established during the marriage . . .;

 . . . .

(f) The economic circumstances of each party at the time the division of property becomes effective;

(g) The income and earning capacity of each party . . .;

(h) The contribution by each party to the education, training or earning power of the other;

(i) The contribution of each party to the acquisition, dissipation, preservation, depreciation or appreciation in the amount or value of the marital property, or the property acquired during the civil union as well as the contribution of a party as a homemaker;

(j) The tax consequences of the proposed distribution to each party;

(k) The present value of the property;

 . . . .

(m) The debts and liabilities of the parties;

 . . . .

(p) Any other factors which the court may deem relevant.

[N.J.S.A. 2A:34-23.1(a)-(p).]

Ordinarily, any property owned by a husband or wife prior to marriage remains the separate property of such spouse and will be considered an immune

asset not eligible for distribution in the event of divorce. Painter v. Painter, 65 N.J. 196, 214 (1974); Valentino, 309 N.J. Super. at 338. There is a rebuttable presumption that each party contributed to any and all income or property acquired during the marriage. Carr v. Carr, 120 N.J. 336, 348 (1990). The burden of establishing the immunity of a particular asset from distribution rests upon the spouse asserting the immunity. Pacifico v. Pacifico, 190 N.J. 258, 269 (2007); Painter, 65 N.J. at 214.

Notably, an exempt asset, such as monies in a bank or investment account, can lose its exempt status where there has been "commingling" of exempt and non-exempt funds. Tannen v. Tannen, 416 N.J. Super. 248, 283 (App. Div. 2010). In other words, an allegedly exempt account may be subject to equitable distribution where: (1) the claim of exemption is not independently corroborated; (2) the account was used to finance the parties' marital lifestyle; and (3) the account was subsequently replenished with marital, non-exempt monies. Id. at 281-83. However, exempt status is not lost through commingling where there was an expressed intent to keep exempt monies separate, despite their placement in a joint account. Dotsko v. Dotsko, 244 N.J. Super. 668, 676 (App. Div. 1990); Wadlow, 200 N.J. Super. at 380-81.

A-2925-23

Here, plaintiff argues that the trial court should have awarded her half of all of defendant's pension/retirement accounts, including Merrill Lynch IRA 51304, Merrill Lynch SEP 11515 (0394), Merrill Lynch Roth IRA 1676, and Merrill Lynch IRA 1628 (which contained what was originally defendant's Sun Life Annuity). She contends that the trial court erred in failing to take into account: (1) defendant's admissions as to commingling funds; (2) the lack of documentary evidence regarding the value of these accounts prior to the parties' marriage; and (3) defendant's questionable credibility.

As the trial court explained,

> [d]uring the financially difficult years of the marriage when his income was allegedly insufficient to meet the needs of the family, [d]efendant took money from his premarital accounts to sustain the family's lifestyle. Defendant testified that the monies he used to finance the family's lifestyle were actually loans from his exempt assets. He further testified that he would then pay himself back, when he could, with money from his income that otherwise would have been marital money during the ensuing years. Defendant testified that this practice continued for many, many years throughout the marriage, from "right after" the start of the marriage in 1996 up to the filing of complaint for divorce in 2019.

It bears noting that the trial court accepted plaintiff's argument that certain of defendant's individual accounts, e.g., Merrill Lynch accounts OU94 and 2376 (collectively valued at $450,755), had been transformed into non-exempt assets

18

because of defendant's extensive commingling of marital funds with the original monies in those accounts, done without any accounting whatsoever. The court confirmed, based on the limited account statements in the record, that there had been both withdrawals from, and contributions made to, those accounts during the marriage. This confirms that the court understood the process for determining whether a specific account is exempt from equitable distribution.

The court also agreed with plaintiff that defendant's Newbridge Securities account (valued at $105,351) was not exempt from equitable distribution because defendant had failed to trace the monies that funded this account to exempt monies. Moreover, the court determined that defendant's Merrill Lynch account OW10 (valued at $89,948 as of the date of the complaint), which he had failed to disclose on any of his CISs, was a non-exempt asset because defendant had offered no testimony regarding this account to rebut the presumption that it was the product of the marriage. Defendant does not challenge any of those findings on appeal.

In contrast, the trial court made only limited findings as to the other accounts that defendant claims were premarital and exempt from equitable distribution. As to defendant's Merrill Lynch IRA 51304, which had a balance of $488,796 as of the date of the complaint, the court noted that according to

19

defendant's testimony, this account was opened in 1980, prior to the marriage, and the last deposit of money into this account was in 1991. The court reviewed account summaries from December 30, 2017, to January 9, 2021—the statement closest to the date of the complaint—and acknowledged that there had been no deposits or withdrawals during that period.

The trial court further noted that defendant testified to opening a SEP IRA in 1979, account number 11515, listed in defendant's CIS as having a value of $107,000.

The trial court also found that, according to defendant's testimony, he opened a Roth IRA, account number 1676, in 1985. The trial court reviewed the twenty pages of documents associated with this account that had been provided by defendant, and again focused its attention on statements dated December 30, 2017, to August 30, 2019. The trial court noted that although the account was listed on defendant's CIS as having a value of $6,900, an August 2019 summary of the account showed a balance of $81,991.

Finally, with respect to defendant's Merrill Lynch IRA 1628 (which contained what was originally defendant's Sun Life Annuity), the trial court did not make any factual findings.

A-2925-23

Our review of the record supports plaintiff's argument that additional findings are needed to support the court's determination that these four accounts were exempt from equitable distribution. Importantly, so far as the record before us shows, defendant did not provide account statements reflecting the monies in these accounts at the time of the parties' marriage in 1996. He also provided no statements for the periods of time when he may have borrowed from and replenished these accounts, even though he testified that he believed he may have borrowed from accounts other than Merrill Lynch OU94 and 2376. Specifically, the trial court found "nothing in the record after [fifteen] trial sessions to show the amounts, or when, [d]efendant 'borrowed' any of the money and, perhaps more significantly, when and how much of marital money he paid himself back."

Finally, the trial court found that defendant's testimony regarding the accounts he claimed were exempt from equitable distribution was not credible. As the trial court explained, "in some instances [d]efendant kept fairly consistent and detailed records;" however, defendant provided "no records or documents that corroborate in any form the financial accounts and property that he now claims are exempt from equitable distribution."

For these reasons, although the trial court was commendably thorough in assessing most assets as part of its equitable distribution analysis, with respect to these four accounts, we are constrained to remand for the court to make specific findings of fact and to consider anew whether any or all of them are subject to equitable distribution.

IV.

We turn next to defendant's contention that the trial court erred in determining that the 27 Berkeley Place property was a non-exempt marital asset. The trial court made the following findings in support of its determination:

> Defendant gave very specific and detailed testimony about this property. Defendant purchased this property during the marriage for $165,000 in 2004. Over the years, he borrowed approximately $405,000 against this property. The property pays approximately $4,000 to $5,000 per year in income to [d]efendant. Defendant alleges that the property is exempt.

> At the same time, [d]efendant has not provided any documents to trace the source of the $165,000 used during the marriage to buy the property, such as bank or wire transfers or a HUD-1, nor did [d]efendant demonstrate that the mortgage payments, over the subsequent [fifteen] years were paid from exempt accounts, or that the profits from this account were kept in a segregated account, and finally, there is nothing in the record to show the intent of the parties was that the property would be exempt.

22

The court also noted that the rent and expenses associated with this property were set forth on the parties' joint tax return, causing the parties to jointly incur taxes on the net income from the property.

Defendant argues that the trial court erred in deeming the 27 Berkeley Place property to be non-exempt because: (1) no marital money was used to acquire it and (2) defendant was the sole party responsible for the property both prior to and after the filing of the divorce complaint.

Defendant initially testified with regard to this property:

> And then [27 Berkeley], which I still contend is . . . exempt from marital split up because no money was ever put into it. I did all the work myself. I bought it, I mortgaged more than I paid for the property because it needed a lot of repair. . . . And I don't make a lot of money on the property, but once again, I didn't put any money into the property.
>
> . . . .
>
> [After learning the property was going to be sold at a Sheriff's Sale,] I went to the bank and I borrowed $185,000, and I only paid $165,000. So I had [$]20,000 left over, which I renovated the apartments, and I've owned the property since then[.]
>
> . . . .
>
> It's exempt because I really, no money was involved in it. It was just pure sweat equity, and, and getting things fixed up, and, and paying the bill myself. I've been paying the mortgages down to, actually, I had

to borrow $30,000 HELOC on that which is still being paid off. I owed about [$]15,000 on that property now. It, the mortgage was been since, the [refinancing] was in 2006. So, it's [seventeen] years into the mortgage. I can't remember the exact date of the refinance.

Later, defendant further discussed the 27 Berkeley Place property in the following colloquy:

[Plaintiff's counsel]: And your purchase price was 165, [$]165,000, correct?

[Defendant]: Well it was a little more than that.

[Plaintiff's counsel]: How much was it?

[Defendant]: I paid about $180,000. And I borrowed, the loan when I bought it was for $220,000. Because I had to rent, I had to fix the place up to make it [livable]. So I needed the extra money. So I didn't use - I was able to borrow more than, back then you could do that. I borrowed more than 100 percent of this price because I got it for a very low price.

[Plaintiff's counsel]: Okay. So this was the purchase price?

[Defendant]: That was the purchase price that I borrowed –

[Plaintiff's counsel]: But you're saying you borrowed more?

[Defendant]: I borrowed [$]185,000 on the first loan. And then I needed another loan a year and half later and I borrowed [$]220,000. So I took money out of the property. I spent the money on the property.

24

This undisputed testimony suggests that, contrary to the trial court's findings, defendant acquired the 27 Berkeley Place property without putting any money down, marital or otherwise, and that his total mortgage on the property was never higher than $220,000, not $405,000. It also appears from the record that defendant did keep a separate bank account where he deposited rental monies and paid bills for this property.

We acknowledge that it would have been helpful if defendant had produced the original and refinanced mortgages on this property, as well as proof that the fifteen years of mortgage payments were made either from the bank account for the property or from some other exempt account. We add that the property was listed on the parties' joint tax return. Given the apparent inconsistencies in the court's factual findings, and given that we are remanding for the court to make additional findings with respect to other assets, we also instruct the court on remand to reconsider and make additional findings with respect to the 27 Berkeley Place property. We offer no opinion on whether this property or the accounts discussed in the preceding section are subject to equitable distribution. In all other respects, the court's findings regarding equitable distribution are affirmed.

A-2925-23

We add that, although equitable distribution is among the factors considered in the alimony calculus, we see no reason why our ruling with respect to the 27 Berkeley Place property or the accounts previously discussed should disturb the alimony awarded. Even if the trial court determines on remand that the property or accounts discussed in this opinion are subject to equitable distribution, it is our view that the alimony awarded remains reasonable. However, we leave it to the sound discretion of the trial court to determine whether the alimony award should be reconsidered in light of its treatment of these assets on remand.

V.

Finally, we address the parties' competing arguments with respect to attorney fees. Plaintiff contends that the trial court erred in reducing her fee award by the $50,000 defendant was court-ordered to pay towards her fees pendente lite. Defendant contends that the fee award must be vacated because the court failed to consider his own fee application and because plaintiff was not entitled to any fee award.

The award of counsel fees and costs in a matrimonial action rests in the discretion of the trial court. R. 5:3-5(c); Eaton v. Grau, 368 N.J. Super. 215,

26

225 (App. Div. 2004). In deciding whether to make such an award, the court

should consider

> (1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.
>
> [R. 5:3-5(c).]

Success in the litigation or the parties' dispute is not a prerequisite for an

award of counsel fees. Kingsdorf v. Kingsdorf, 351 N.J. Super. 144, 158 (App.

Div. 2002). Also, where one party acts in bad faith, the relative economic

positions of the parties are of little relevance because the fee award is then

intended to protect the innocent party from unnecessary costs and to punish the

guilty party. Yueh v. Yueh, 329 N.J. Super. 447, 461 (App. Div. 2000).

The court in Kelly v. Kelly, 262 N.J. Super. 303, 307 (Ch. Div. 1992),

discussed the issue of counsel fees in matrimonial cases as follows:

> Fees in family actions are normally awarded to permit parties with unequal financial positions to litigate (in good faith) on an equal footing. . . . With the addition of bad faith as a consideration, it is also apparent that

fees may be used to prevent a maliciously motivated party from inflicting economic damage on an opposing party by facing expenditures for counsel fees. This purpose has a dual character since it sanctions a cmaliciously motivated position and indemnifies the "innocent" party from economic harm.

The Kelly court went on to define bad faith as intentionally misleading or deceiving another, thereby precipitating legal action, and noted that more than a simple mistake was required before a party would be found guilty of bad faith. Id. at 308; accord Von Pein v. Von Pein, 268 N.J. Super. 7, 19-20 (App. Div. 1993). Other examples of bad faith include misusing or abusing process, seeking relief not supported by fact or law, intentionally misrepresenting facts or law, or otherwise engaging in vexatious acts for oppressive reasons. See Borzillo v. Borzillo, 259 N.J. Super. 286, 293-94 (Ch. Div. 1992).

According to Rule 1:7-4, a court in non-jury trials and on motions must "by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law." In particular, a judge in awarding attorney fees must give reasons for the award, based upon the relevant factors, lest the award be set aside. Gordon v. Rozenwald, 380 N.J. Super. 55, 79 (App. Div. 2005); Clarke v. Clarke ex rel. Costine, 359 N.J. Super. 562, 572 (App. Div. 2003).

28

"Failure to perform this fact-finding duty 'constitutes a disservice to the litigants, the attorneys and the appellate court.'"  Chambon v. Chambon, 238 N.J. Super. 225, 232 (App. Div. 1990) (quoting Curtis v. Finneran, 83 N.J. 563, 569-70 (1980)).  When a trial court fails to set forth the reasons for its opinion, meaningful appellate review is inhibited.  Chambon, 238 N.J. Super. at 232.  The absence of adequate findings will generally warrant a reversal of the lower court's decision.  Heinl v. Heinl, 287 N.J. Super. 337, 347 (App. Div. 1996).

During the trial, plaintiff testified that her total counsel fees were approximately $125,000, that Eisner Amper's fee had been over $50,000, and that she had also paid fees for mediation.  She confirmed that she owed nothing to her first two attorneys, Kornitzer Family Law, LLC, and Snyder Sarno D'Aniello Maceri da Costa LLC.  Defendant did not testify regarding his counsel fees.

At the conclusion of the trial, the parties filed cross-motions for counsel fees and costs.[3]  Defendant's motion indicated that he had incurred $255,819.20 in attorney fees.

In the portion of its opinion addressing only plaintiff's request for counsel fees, the trial court first found that defendant's financial resources were

---

[3] We note that plaintiff's application is not included in the record on appeal.

significantly greater than plaintiff's, highlighting that, since the litigation began, defendant had loaned Gorga $700,000. In the court's view, defendant had the resources to contribute to plaintiff's fees.

Next, the trial court was satisfied that defendant had taken unreasonable positions during the litigation. In particular, defendant sought to avoid alimony after a twenty-three-year marriage based upon a claimed imminent retirement. However, the court found that this claim was undermined by defendant's advancement of monies to Gorga and waiver of $139,000 in interest, in anticipation of earning significant future commissions as a realtor in connection with the 95 Shepherds Lane and Maple Ave projects. Additionally, defendant had produced no evidence in support of his claim that several of his Merrill Lynch accounts and the 27 Berkeley Place property were exempt from equitable distribution.

The trial court next noted that, while defendant had not identified the amount of attorney fees he had incurred, plaintiff had provided the court with submissions from four law firms in support of her request for a fee award. However, two of these submissions, one from Kornitzer Family Law, LLC, and one from Snyder Sarno D'Aniello Maceri da Costa LLC, did not set forth the total fees incurred and did not include certifications from the attorneys involved

30

in representing plaintiff. Because the court was unable to address the reasonableness of the claimed fees or the work involved, it declined to award any fees related to those submissions.

The trial court noted that the third submission from the Weiner Law Group included invoices from January 4, 2022, to September 15, 2023, reflecting the work performed by three individuals including plaintiff's trial counsel, and set forth the aggregate amount billed. Again, because it had not been provided with certifications from the two other attorneys, apart from trial counsel, who worked on the file, the court noted that no fees would be awarded in connection with their work. The final submission from the Moskowitz Law Group (which plaintiff's trial counsel joined in October 2023) included a certification from counsel and invoices showing that plaintiff had incurred $24,205 in fees between October 10, and December 20, 2023.

Next, the trial court observed that plaintiff had not advised how much she had paid to counsel. It noted that, by order dated April 16, 2021, plaintiff had been awarded $50,000 in fees, and that, following the sale of 29 Berkeley Place, plaintiff had received an additional $100,000 towards her fees.

The trial court was satisfied that the results obtained by plaintiff were favorable, as she had prevailed on the issues of alimony and certain claimed

31

exempt assets. While there were significant disputes regarding discovery, no fees were ordered in connection with any of her motions to compel.

The trial court concluded that defendant had acted in bad faith in asserting that: (1) the 27 Berkeley Place property, although purchased during the marriage, was exempt, without any supporting documentation; (2) his premarital accounts were exempt despite no supporting documentation, and notwithstanding that these accounts helped support the family for many years, and that marital monies were deposited into those accounts, including over $500,000 from the Morristown Gateway project; (3) the expenditures from his premarital accounts were loans for which he had been paying himself back, again without any supporting documentation; and (4) he was entitled to a $500,000 Mallamo credit based upon numerous claimed expenditures, again without documentation or precise description.

The court found that the matter presented several difficult issues concerning commingling of assets, prospective retirement, and diversion of assets by defendant. The court observed that defendant was represented by two attorneys at trial, thereby confirming the complexity of the issues.

After reviewing the time entries submitted by plaintiff's trial counsel from June 5, 2023, when witness testimony commenced, through the date he prepared

his written closing, the court was satisfied that the time claimed (184 hours) was reasonable and that counsel's hourly rate ($330) was appropriate. Accordingly, the court awarded plaintiff counsel fees of $60,720. The court also awarded plaintiff $6,900 in expert fees for a total award of $67,620.

We see no abuse of discretion in the court's calculation of the attorney fees owed to plaintiff, subject to an important caveat. Defendant argues in his cross-appeal that the trial court failed to address his own fee application. He argues that plaintiff acted in bad faith by repeatedly requesting discovery that had already been provided, by failing to disclose an inheritance, and by wrongfully seeking alimony when she earned more from her job than he did. We remand for the trial court to address defendant's fee application, which may offset the award granted to plaintiff. We offer no opinion on whether defendant is entitled to attorney fees, or, if so, in what amount.

To the extent we have not addressed any argument raised by either party in the appeal or cross-appeal, it is because it lacks sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E). The matter is remanded for proceedings consistent with this opinion. As to issues that do not require a remand in accordance with this opinion, the judgment of the trial court is affirmed.

Affirmed in part and reversed and remanded in part on both the appeal and cross-appeal. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division